UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| RAFAEL L. WALKER, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> DAVID GILSTRAP, et al., ) <br> ) <br> Defendants. ) | No. 2:23-cv-00150-JMS-MG |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Rafael Walker, who is incarcerated by the Indiana Department of Correction ("IDOC"), alleges in this case that Defendants denied his right to practice his religion in a number of ways and denied him clean clothing and bedding. Defendants have moved for summary judgment. For the reasons below, that motion is **GRANTED IN PART AND DENIED IN PART**.

**I.**
**Standard of Review**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need

not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar*, 985 F.3d at 572–73.

### A. The Parties

During the time at issue, Defendants were employed in the following capacities: (1) Defendant Brown was an IDOC Program Director; (2) Defendant Vanihel was the Warden of Wabash Valley Correctional Facility ("WVCF"); (3) Defendant Gilstrap was a Correctional Property Officer; (4) Defendant Holcomb was a Correctional Lieutenant; (5) Defendant Wellington was a Grievance Manager; (6) Defendant Crichfield was a Grievance Specialist; and (7) Defendant Faust was a facility chaplain. Dkt. 1 at 1-2, 12 (Complaint). During all times relevant, Mr. Walker identified was a practicing Catholic. Dkt. 52-1 at 11 (Walker Dep.).

Mr. Walker was transferred to WVCF on January 28, 2021, and was housed in the Secured Housing Unit ("SCU") because of his placement in department-wide restricted-status housing ("RSH"). *Id.* at 8-10. For the first year that Mr. Walker was incarcerated at WVCF, he practiced his religion without issue. *Id.* at 13.

**B. Religious Property**

Mr. Walker was placed on strip cell status on January 6, 2022. *Id.* at 12. When Officer Brewer, a non-party, inventoried his property in preparation for his strip cell status, the only religious necklaces noted to be in his possession were four rosaries. See Dkt. 52-2 at 1-2 (Gilstrap First Interrogatories); dkt. 52-3 at 1, 4 (Property Documents). Mr. Walker affirms that he also had a religious medallion[1] in his property that was also confiscated at that time.[2] Dkt. 52-1 at 19. When Mr. Walker's strip cell status was lifted on or around January 9, 2022, Officer Brewer gave Mr. Walker his allowable property items but failed to return his rosaries and medallion. Dkt. 52-1 at 12.[3] At this time, IDOC policy generally limited inmates to possessing only one religious medallion and one set of prayer beads, including rosaries, at any given time. Dkt. 52-4 at 1-2 (Relig. Ppty. Guid.). According to Officer Gilstrap, three of Mr. Walker's rosaries were confiscated and locked in his stored property while the remaining rosary was placed in his allowable property box. Dkt. 52-2 at 1-2; dkt. 52-3 at 1. The allowable property box contained the personal items that inmates were allowed to access once their strip cells status ended. *See* dkt. 52-2 at 1-2.

---

[1] This medallion was an ornamental medal that depicted the Catholic miracle of the immaculate conception. Dkt. 52-1 at 14-15.
[2] Mr. Walker suggests that the discrepancy between his actual property and the inventory form arose because Officer Brewer mistakenly noted that he had four rosaries rather than three rosaries and one medallion. *See* dkt. 62 at 3.
[3] Defendants contend that Mr. Walker was allowed one of his rosaries after coming off of strip cell and that no medallion was on his property sheet. Dkt. 52-2 at 2.

After his release from strip cell status, Mr. Walker submitted several informal request forms to Officer Gilstrap, Lieutenant Holcomb, Chaplain Faust, and Warden Vanihel asking for the return of his rosary and medallion. Dkt. 63 at 4-10.[4] Mr. Walker spoke to Lieutenant Holcomb about his missing rosary, and Lieutenant Holcomb assured him that he would ask Officer Gilstrap to look into the issue. Dkt. 52-1 at 17-18. Mr. Walker also submitted two grievances concerning his rosaries. Dkt. 52-6 at 1-2 (Walker Grievances). In the first grievance, submitted January 11, 2022, Mr. Walker stated: "My property was confiscated, my photo albums & loose photos, 3 rosary, 2 soap, brush, … which I never received any back…." Dkt. 52-6 at 1. For relief, asked "to receive back all allowable items: 3 soaps, club brush, 1 rosary, all photos."[5] *Id.* Ms. Crichfield responded to the grievances by asking Officer Gilstrap to determine the status of Mr. Walker's rosaries and if he needed replacements. *See* Dkt. 52-2 at 5. As Property Officer, Officer Gilstrap had the authority to review inmates' property records to determine whether they required or could receive additional property based on any applicable IDOC or facility rules. *See* Dkt. 52-7 at 3 (Holcomb Interrogatories). Based on his review of the relevant records, Officer Gilstrap

---

[4] In response to the motion for summary judgment, Mr. Walker designates the affidavits of several fellow inmates stating: "I witness Holcomb, Gilstrap, Criechfield, Wellington, and Vanihel repeatedly refused to return Mr. Walker's rosary so that he may use in prayer and other things…." Dkt. 63-1 at 302, 305, 308, 311 (errors in originals). But this general evidence, with no specific description regarding the dates, context, or details regarding how these defendants refused Mr. Walker's rosary is not enough to overcome Mr. Walker's specific testimony that Lieutenant Holcomb told him he would look into his missing rosary and that he communicated with the other defendants through request forms or grievances. *See Daugherty v. Page*, 906 F.3d 606, 611 (7th Cir. 2018) ("Summary judgment is not a time to be coy: conclusory statements not grounded in specific facts are not enough."); *cf. Boss v. Castro*, 816 F.3d 910 919 (2016) (plaintiff's general complaints of being subjected to "a barrage of criticism" and "workplace stresses," without identifying specific incidents, not sufficient to overcome summary judgment).

[5] The defendants claim that Mr. Walker did not assert that he had no rosaries in his possession in this grievance. Dkt. 53 at 4. But a reasonable reading of Mr. Walker's statement that he "never received any back" and that he wished to receive his allowable property, including one rosary, is that he did not have a rosary at the time.

4

determined that Officer Brewer had issued one of Mr. Walker's rosaries to him upon his release from strip cell status, and therefore, he was not eligible to receive another rosary. Dkt. 52-2 at 2.

Mr. Walker submitted a second grievance on March 15, 2022, stating: "I have written multiple request[s] to Gilstrap & Lt. Holcomb to receive my religious necklace & they refuse to bring it to me." Dkt. 52-6 at 2. For relief, he asked, "to receive my plastic white rosary from stored property, not to have my religious freedom suppressed, to be able to wear religious necklace." *Id.*

The chaplain's office received Requests for Interviews ("ROIs") from Mr. Walker on April 1, 2022, April 11, and April 19, 2022, asking for a rosary. Dkt. 22-1 at 9, 13, 15 (Walker's Initial Disclosures). Defendants assert that, on April 19, 2022, the chaplain's office sent him a rosary from their stock of donated items. *See* dkt. 22-1 at 15; dkt. 52-8 at 3. Mr. Walker testifies he was without his rosary until April of 2023. Dkt. 52-1 at 25. There is no evidence that Mr. Walker made any further requests for rosaries. *See generally* dkt. 22-1 at 16-29, 33-70.

According to his teachings and beliefs, Mr. Walker was required to use a rosary to recite Hail Mary prayers or "make penance." Dkt. 52-1 at 14. According to Mr. Walker, it would be "improper" to initiate prayer without it. *Id.*

In or around August of 2022, Mr. Walker wrote to a Catholic organization requesting that they provide him with a replacement medallion. Dkt. 52-1 at 26; dkt. 52-6 at 7. On August 8, 2022, the organization sent Mr. Walker a letter advising him that they sent him one. Dkt. 52-1 at 26; dkt. 52-6 at 7. Chaplain Faust reviewed Mr. Walker's incoming medallion to determine whether he could receive the item based on his current property and IDOC policy. Dkt. 52-8 at 2, 3. Based on his review of the chapel records, he determined that he had delivered Mr. Walker a medallion in November of 2021. *Id.* at 3. Chaplain Faust asked Officer Gilstrap to determine if Mr. Walker still had that medallion. See dkt. 52-8 at 3. According to Officer Gilstrap, there was no reason to believe

5

that Mr. Walker's medallion was confiscated or that he did not have it because there were no confiscation forms or other records to indicate that staff had confiscated that item, which is required by procedure. Dkt. 52-8 at ¶ 8. Chaplain Faust therefore denied the incoming medallion based on IDOC property restrictions and his belief that Mr. Walker already had one. *Id*. Chaplain Faust then asked his supervisor if his denial was appropriate. *Id.* Chaplain Faust's supervisor conferred with Officer Gilstrap, and they agreed that, because there was no evidence to indicate that Mr. Walker did not have a medallion in his personal property at that time, he was not entitled to a replacement. *Id.*

On August 18, 2022, Mr. Walker submitted a grievance asking why he had not yet received the medallion as promised in his letter. Dkt. 52-6 at 6. Ms. Crichfield returned the grievance because she believed that Mr. Walker already had a medallion. Dkt. 52-6 at 8, 11. She advised him to file a Notice of Tort Claim to address his concerns that the property was misplaced. *Id.* On August 26, 2022, Mr. Walker received a notice stating that the medallion the organization sent him was confiscated because staff determined that Mr. Walker already had a medallion in his personal property. Dkt. No. 52-6 at 13. Mr. Walker then submitted a second grievance asserting that he did not have the original medallion and requesting to have the replacement released to him. Dkt. 52-6 at 10. That grievance was denied because there was no evidence to suggest that Mr. Walker did not still have his prior-issued medallion. *Id.* at 14.

Mr. Walker seeks to hold Defendants liable for failing to take "all steps" possible to verify whether he had rosaries or medallions in his possession during the relevant timeframe. In particular, he cites their failure to conduct shakedowns of his cell to verify that he had those items. *See* Dkt. 52-1 at 27-28, 36.

**C. Religious Services**

During the relevant time, because of their restricted movement and security concerns, inmates housed in RSH were not permitted to attend group religious services. Dkt. 52-8 at 4. Instead of attending group services, RSH inmates receive one-on-one religious services by asking the chaplain's office or staff, in advance, to provide them access to any particular religious services they required. *Id.* 4. Inmates were free to submit as many requests as desired and could do so at any time. *Id.* at 4-5.

None of the chaplains at WVCF at the time had the spiritual authority or training to perform Catholic rites or rituals. *Id.* While Mr. Walker was in RSH, Chaplain Faust regularly conducted rounds of his unit, he would announce his presence, wait for inmates to ask for his assistance, and provide one-one-one spiritual guidance, information, and/or limited Lutheran religious services. *Id.* at 5-6. Other chaplains also conducted similar rounds in a similar fashion when Chaplain Faust was not on duty. *Id.* Chaplain Faust performed these rounds on Mr. Walker's range at least twenty times in 2021 and thirty times in 2022. *Id.* at 6. Chaplain Faust testifies Mr. Walker did not verbally ask him for counseling, religious services, or any other religious assistance during these rounds. *Id.* On the other hand, Mr. Walker has presented several Request for Interview forms asking for religious services. *See* dkt. 22-1 at 2, 15, 17, 24, 26, 27, 29.[6]

---

[6] Chaplain Faust contends that the ROIs Mr. Walker submitted regarding his access to religious services during the time relevant contained just one page of writing on the front side of the ROI without reference to or attached additional pages providing more information. Dkt. 52-8 ¶ 14. Chaplain Faust suggests that Mr. Walker "inserted these additional pages … for the purposes of initiating this litigation." Dkt. 53 at 9 (citing dkt. 22-1 at 2, 15, 17, 24, 26, 27, 29). To the extent that Chaplain Faust is understood to ask the Court to conclude that Mr. Walker fabricated the second page of these documents, such weighing of the evidence is inappropriate at the summary judgment stage even though this argument may be raised if this case proceeds to trial.

On May 16, 2022, Mr. Walker submitted a grievance, stating: "I haven't been receiving any religious services since I've been in restricted housing….The Chaplain never comes to see to my personal religious needs weekly as policy states they should…." Dkt. 52-6 at 4. Ms. Crichfield inquired with the chaplain's office, and they assured her that they had no knowledge of Mr. Walker ever requesting religious services but that he was welcome to submit any future requests to the department for assistance. *See id.* at 5. On September 12, 2022, Mr. Walker submitted a second grievance stating, "I [have] been requesting to participate in religious services for 20 months. I have written to Jackie Brown after S. Crichfield didn't process the last grievance and [was informed] just to continue to write chapel." *Id.* at 15. Ms. Crichfield also denied that grievance due to untimeliness. *Id.* at 16.

### D. Clean Clothes and Bedding

In 2022, according to RSH property restrictions, inmates were only allowed to access three sets of state-issued permissible clothing items at a given time, one set of clothes to wear on their person and two sets to possess in their cell. Dkt. 52-1 at 42, 44-45. This included a jumpsuit, t-shirt, boxers, socks, and a towel. *Id.* at 45. About every other day, RSH inmates would receive showers. *Id.* At this time, the inmate would send their used clothing items out to be laundered and receive a fresh set of clothing items in exchange on the following day. *Id.* Laundry was generally conducted by inmate workers. *Id.* at 43. If an inmate believed he needed replacement clothing, he was required to submit requests for new clothing to Officer Gilstrap, who would decide whether the inmate required additional clothing items based on his existing property and any applicable property restrictions. Dkt. 52-5 at 5.

Mr. Walker testified that between April of 2022 and September of 2022, there were four instances in which he sent two sets of his used clothing out to be laundered but did not receive

clean clothing in return. *See* dkt. 52-1 at 42 ("I believe, like I said, it came up missing even twice in May, like twice in July"); *see* dkt. 52-6 at 17-32. On April 21, 2022, Mr. Walker filed a grievance asserting that he never received his laundered clothing items and requesting two sets of clothing to replace the lost items. Dkt. 52-6 at 17. He then submitted two additional grievances, on May 5 and 9, 2022, complaining that he still had not yet received additional clothing and that he had been unable to change his clothes since his laundry went missing in April. *Id.* at 18, 19. In response to these grievances, Ms. Crichfield relayed Mr. Walker's concerns to Officer Gilstrap and/or the other acting property officer at the facility. Dkt. 52-9 at 4 (Crichfield Interrogatories). On May 9, 2022, a non-party provided Mr. Walker with one additional towel, wash cloth, and laundry bag and two sets of boxers, T-shirts, and socks. Dkt. 52-3 at 3.[7]

On May 23, 2022, Mr. Walker's laundry was lost for a second time, and he submitted a grievance reporting his need to receive two additional sets of clothing. See dkt. 52-6 at 20. Ms. Crichfield responded to the grievance stating that she notified Officer Gilstrap. See *id.* at 21. On June 7, 2022, Gilstrap issued Mr. Walker one additional towel, washcloth, and pair of socks, and two sets of boxers and T-shirts. Dkt. 52-3 at 3.

Mr. Walker's laundry was misplaced for a third time on June 17, 2022. Dkt. 52-6 at 22. Mr. Walker filed a grievance the next day requesting more clothing, and Ms. Crichfield again responded stating that she forwarded Mr. Walker's property request to Officer Gilstrap. *Id.* at 22, 23. Mr. Walker submitted additional grievances on June 20, 2022, July 10, 2022, and July 19, 2022, inquiring why he had not yet received his requested items. *Id.* at 24-28. Ms. Crichfield responded to the first two grievances by indicating that Officer Gilstrap was informed of the

---

[7] Mr. Walker contends that he did not receive clean clothing until June 17, but the record he cites for this proposition reflects that he was issued clothing on May 9. Dkt. 63 at 58.

9

situation and advising Mr. Walker to submit further requests for clothing directly to Officer Gilstrap. *Id.* When Ms. Crichfield responded to the third grievance, the problem was deemed resolved without providing Mr. Walker with replacement items. *Id.* at 28-30.

On August 4, 2022, Mr. Walker's laundry went missing for the fourth time. See *id.* at 30. That day, Mr. Walker grieved the missing property and again requested replacement items. *Id.* Ms. Crichfield responded by reminding Mr. Walker that the proper course of action was to submit requests to Officer Gilstrap for further clothing. *Id.* at 31. On September 12, 2022, Mr. Walker submitted another grievance requesting two sets of replacement clothing items. *Id.* at 32. On September 14, 2022, Mr. Walker was again given one additional towel, washcloth, pair of boxers, T-shirt, and pair of socks. Dkt. 52-3 at 3. Mr. Walker testified that he verbally told both Lieutenant Holcomb and Officer Gilstrap that he needed additional clothing at least once during the relevant timeframe. Dkt. 52-1 at 43-45. Both indicated that they would look into the issue and/or attempt to obtain the items, but Mr. Walker could not recall any further details regarding those conversations. *Id.*

Mr. Walker testified that because he did not have clean clothing, he developed hives and rashes that he treated with creams available at commissary. *Id.* at 48-49.

### E. Personal involvement of Defendant Wellington

During the relevant timeframe, Defendant Wellington did not work in the capacity of a grievance specialist and was not involved in reviewing or responding to Plaintiff's grievances. Dkt. 52-10 at 3-4 (Wellington Interrogatories). Mr. Walker never spoke with Mr. Wellington regarding his access to religious property or services and only would have apprised him of these complaints via his grievances. Dkt. 52-1 at 20.

## III.
## Discussion

### A. Wellington's Personal Responsibility[8]

First, Defendant Thomas Wellington argues that he is entitled to summary judgment because he was not personally involved in the alleged deprivations of Mr. Walker's rights. "[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted). "The plaintiff must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct." *Id.* For a public official to be individually liable for a subordinate's constitutional violation, the official must both "(1) know about the conduct and (2) facilitate, approve, condone, or turn a blind eye toward it." *Gonzalez v. McHenry County, Ill.*, 40 F.4th 824, 828 (7th Cir. 2022).

Mr. Walker argues that, as the Grievance Manager, Mr. Wellington was responsible for ensuring that Ms. Crichfield performed her duties under IDOC policy. But the designated evidence is that Mr. Wellington was not involved in reviewing Mr. Walker's grievances and that Mr. Walker did not speak to Mr. Wellington personally about his concerns. Dkt. 52-10 at 3-4; dkt. 52-1 at 20. There is therefore no evidence that Mr. Wellington was personally involved in the acts at issue and he is entitled to summary judgment.

### B. First Amendment Free Exercise

To succeed on his First Amendment free-exercise claim, Mr. Walker must convince the factfinder that the defendants "personally and unjustifiably placed a substantial burden on his

---

[8] Only Defendant Wellington seeks summary judgment on the premise that he was not personally involved in the acts at issue.

religious practices." *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016). "A substantial burden puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* (cleaned up). Mr. Walker alleges that his free exercise rights were denied when he was denied his medallion, his rosary, and access to religious services.

### 1. Medallion

Mr. Walker alleges that Defendants Faust, Vanihel, Crichfield, Wellington, and Brown denied him his religious medallion. They argue that the denial of the medallion did not substantially burden Mr. Walker's right to practice his religion. To demonstrate that his right to practice his religion was substantially burdened, a prisoner must present evidence that the burden imposed on him "denied [him] something distinctly important for effective religious practice."[9] *Gelford v. Frank*, 310 F. App'x 887, 889 (7th Cir. 2008) (citing *Borzych v. Frank,* 439 F.3d 388, 390 (7th Cir. 2006)). The plaintiff's "unreasoned say-so" is not enough. *Id.*; *see also McNair-Bey v. Bledsoe*, 165 F.3d 32 (7th Cir. 1998) (plaintiff presented no evidence that wearing the pin at issue is a tenet of his faith).

Mr. Walker has not designated evidence that the medallion was distinctly important for his religious practice. Defendants are entitled to summary judgment on this claim.

### 2. Rosary

Mr. Walker alleges that Defendants Holcomb, Gilstrap, Wellington, and Crichfield refused to ensure that his rosary was returned to him. Defendants argue that they did not violate Mr. Walker's First Amendment right to exercise his religion because they did not intentionally deprive him of a rosary.

---

[9] The defendants do not make this argument as to Mr. Walker's other Free Exercise claims.

The evidence in the light most favorable to Mr. Walker is that when he came off of strip cell status on January 9, 2022, Officer Brewer returned his property, but did not give him one of his rosaries, which he was permitted to have under IDOC policy. Dkt. 52-1 at 12; dkt. 52-4 at 1-2. Mr. Walker requested the return of his rosary through informal ROIs and grievances. Dkt. 22-1 at 9, 13, 15; dkt. 52-6 at 1-2. He also spoke to Lieutenant Holcomb directly asking for his rosary, who told him he would ask Officer Gilstrap. Dkt. 52-1 at 17-18. Officer Gilstrap reviewed Mr. Walker's property records and concluded that Officer Brewer had given Mr. Walker one of his rosaries when he was released from strip cell status and therefore wasn't eligible to receive another one. Dkt. 52-2 at 2, 5; dkt. 52-5 at 1, 2; 52-4 at 1-2. Mr. Walker submitted another grievance and several ROIs asking for his rosary. Dkt. 52-6 at 2; dkt. 22-1 at 9, 13, 15. Mr. Walker testified that he did not receive a rosary until April of 2023. Dkt. 52-1 at 25.

Defendants argue that they never intentionally denied Mr. Walker his right to have a rosary to use in prayer. The Seventh Circuit has explained that "[p]rison officials may not intentionally and substantially interfere with an inmate's ability to practice his faith unless the restriction is reasonably related to a legitimate penological interest." *Garner v. Muenchow*, 715 Fed. Appx. 533, 536 (7th Cir. 2017). For example, the plaintiff in *Garner* sought to order a Quran while he was in segregation. *Id.* at 535. He wrote to the unit manager, who initially ignored his requests and later sent him on "a wild goose chase for the catalog" before finally acknowledging that catalogs were unavailable. *Id.* In the meantime, the unit manager directed the plaintiff to other staff, who knowingly denied his requests for a catalog and the chaplain directly denied his request to borrow a Quaran. *Id.* The court concluded that, based on these facts, a jury could conclude that the defendants intended to prevent the plaintiff from practicing Islam for months. *Id.* at 536. On the other hand, the Seventh Circuit has found that prison officials did not violate a prisoner's free

13

exercise rights when they "made a mistake" that resulted in the delay of an important religious feast. *Hambright v. Kemper*, 705 F. App'x 461, 463 (7th Cir. 2017).

Here, it is undisputed that when Mr. Walker asked for his rosary, Defendants attempted to verify whether he had one in his possession. They believed that he did have one because records indicated that he did, even though those records were apparently erroneous. Although Mr. Walker contends that they should have done more to confirm whether he had a rosary, he has not designated evidence that would allow a jury to conclude that their failure to do so was more than negligence. Like the defendants in *Hambright*, Defendants here "made a mistake" in failing to provide Mr. Walker his rosary. There is no evidence that they intended to keep it from him. Defendants are therefore entitled to summary judgment on Mr. Walker's claim that he was denied access to his rosary.

### 3. Religious Services

The evidence in the light most favorable to Mr. Walker is that he submitted several Request for Interview forms asking for religious services, but never received services while he was in RSH. Dkt. 22-1 at 15 (ROI to chaplain asking for pray sessions, counseling, communion, and confession), 17 (ROI to nonparty asking for religious services), 24 (ROI to Vanihel asking for religious services, among other things), 26 (ROI to chaplain asking for religious services), 27 (same), 29 (ROI to Ms. Crichfiled asking for religious services). Defendants argue that they could not have intentionally deprived Mr. Walker of the right to practice his religion because, without being informed of what specific services he wanted, they couldn't have intentionally denied him any particular service. But it is undisputed that Mr. Walker regularly requested religious services and received little response from the Defendants. Defendants compare Mr. Walker's claims to those in *Hambright*. The plaintiff in that case alleged that his First Amendment rights were violated

when the defendants failed to timely provide the Eid al-Fir feast at the end of Ramadan. 705 F. App'x at 461. The court held that the failure to provide the feast in a timely manner was a "mistake," noting that prison officials "'clearly dropped the ball'" and therefore did not rise to the level of a First Amendment violation. *Id.* at 463. Unlike in *Hambright*, however, a jury could conclude here that Defendants didn't just drop the ball, but actually ignored Mr. Walker's requests for services since they could have followed-up with Mr. Walker and inquired regarding what services he sought. For example, Chaplain Faust admits that Mr. Walker submitted ROIs requesting religious services, but states that because he did not specify the type of service he was seeking, "the chaplain's office would have had no way of knowing that Plaintiff was specifically seeking access to Catholic communion, confession and any other Catholic sacrament." Dkt. 52-8 ¶ 14. But Chaplain Faust also testifies that he regularly walked Mr. Walker's range. *Id.* ¶ 13. Based on these facts, a reasonable jury could conclude that Chaplain Faust was aware that Mr. Walker had requested services and could easily have talked to him about his requests when he walked the range. Thus, that jury could conclude that the failure to do so was more than a mistake but reflected an intent to deny Mr. Walker services. Further, none of the Defendants other than Mr. Wellington, seek summary judgment on the premise that they were not personally involved in the alleged denial of religious services. Therefore, Defendants (except Mr. Wellington) are not entitled to summary judgment on this claim.

### C. Conditions of Confinement

Finally, Mr. Walker contends that Defendants Crichfield, Holcomb, and Gilstrap failed to remedy the fact that he was denied clean clothing and bedding.[10]

---

[10] The defendants argue that, at his deposition that Mr. Walker "did not indicate that any deficits in his receipt of clean bedding were a part of his Eighth Amendment claim." Dkt. 53 at 13 n.7 (citing dkt. 52-1 at

15

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). To demonstrate that the conditions of confinement violate the Eighth Amendment's prohibition against cruel and unusual punishment, there must be (1) "a deprivation that is, from an objective standpoint, sufficiently serious that it results 'in the denial of "the minimal civilized measure of life's necessities,"' and (2) where prison officials are deliberately indifferent to this state of affairs." *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (quoting *Farmer*, 511 U.S. at 834). Prison conditions may be unconstitutionally unacceptable if they "pose a 'substantial risk to inmate health or safety.'" *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Farmer*, 511 U.S. 837). But "conditions 'may be uncomfortable, even harsh, without being inhumane.'" *Estate of Simpson*, 863 F.3d at 745 (quoting *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664–65 (7th Cir. 2012)).

Defendants argue that Mr. Walker having to re-wear his clothing for weeks at a time on four occasions does not constitute a deprivation of "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. They point out that the Seventh Circuit has held that poorly laundered clothing does not constitute an Eighth Amendment violation. *See Myers v. Indiana Dep't of Correction*, 655 F. App'x 500, 503–04 (7th Cir. 2016)

The evidence in the light most favorable to Mr. Walker is that he didn't have clean laundry on the following dates in 2022: between April 21 and May 9, between May 23 and June 7, between June 17, and about July 19, and between August 4 and September 14. He contends that wearing

---

40)). Mr. Walker did testify at his deposition that he claims his Eighth Amendment rights were violated because he was denied clean clothes. Dkt. 52-1 at 40. But this is not enough to find that he has abandoned his claim regarding denial of clean bedding as well.

dirty clothes for weeks at a time caused him caused him skin irritations. A reasonable jury could conclude that going without clean clothes and bedding several times for weeks at a time deprived him of "the minimal civilized measure of life's necessities." *Cf. Myers*, 655 F. App'x at 504 (noting that the court could "imagine situations where an inmate's prolonged exposure to soiled clothing creates a constitutionally intolerable risk of serious injury").

Defendants go on to argue that they had no reason to know that Mr. Walker's laundry issues placed him at risk of skin maladies. They point out that he did not raise concerns about health issues when he complained about not having clean laundry. But a reasonable jury could conclude that, as Mr. Walker alleges, having to wear dirty clothes for weeks at a time could cause health problems and caused Mr. Walker's skin irritation.

Defendants Crichfield and Holcomb further argue that, when they received Mr. Walker's complaints about his laundry, they responded by advising Officer Gilstrap of the issue. Officer Gilstrap contends that he responded appropriately by reviewing Mr. Walker's request and his existing property and providing any necessary clothing.

It is undisputed that Defendants Crichfield and Holcomb directed Mr. Walker's laundry complaints to Officer Gilstrap. Dkt. 52-9 at 4; dkt. 52-6 at 21-22, 24-28, 31; dkt. 52-1 at 43-45. And there is no evidence that these Defendants had reason to believe that Officer Gilstrap would not address these concerns. They are therefore entitled to summary judgment.

There is, on the other hand, evidence from which a jury could conclude that Officer Gilstrap was made aware of Mr. Walker's lack of clean laundry and delayed in providing him with replacements. Officer Gilstrap therefore is not entitled to summary judgment on this claim.

**IV.
Conclusion**

Defendants' motion for summary judgment, dkt. [51], is **GRANTED IN PART AND DENIED IN PART**. The motion is **GRANTED** as to all claims against Defendant Wellington, as to Mr. Walker's claims that he was denied a rosary and a medallion, and as to Mr. Walker's claims against Defendants Crichfield and Holcomb that he was denied clean laundry. The motion is **DENIED** as to Mr. Walker's claim that Defendants Faust, Vanihel, Crichfield, Wellington, and Brown denied him religious services and that Defendant Gilstrap denied him clean laundry. The **clerk shall terminate** defendant Wellington on the docket.

The Court prefers that Mr. Walker be represented by counsel for the remainder of this action. The **clerk is directed** to send Mr. Walker a motion for assistance recruiting counsel with his copy of this Order. Mr. Walker shall have **twenty-eight days** to file a motion for counsel using this form motion or to inform the Court that he wishes to proceed pro se. Once the motion has been ruled on and counsel has been recruited, the magistrate judge is asked to schedule a telephonic status conference to discuss further proceedings.

**IT IS SO ORDERED.**

Date: 3/4/2025

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

RAFAEL L. WALKER
166671
MIAMI - CF
MIAMI CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All Electronically Registered Counsel

Magistrate Judge Garcia's Chambers